**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JUAN A. MOLINA,

            Plaintiff,

              -against-

JOHN JAY INSTITUTE FOR JUSTICE AND
OPPORTUNITY/CITY UNIVERSITY OF NEW
YORK; RESEARCH FOUNDATION FOR CUNY;
RESEARCH CONSORTIUM OF JOHN JAY;
SUSAN BATKIN; ANN JACOBS; and
KATHERYNE RALPH in their individual capacities
and as aiders and abettors

              Defendants.

**SUMMONS &**
**FIRST AMENDED**
**COMPLAINT**


**JURY TRIAL DEMAND**

      PLAINTIFF, JUAN A. MOLINA ("MOLINA" or "PLAINTIFF") by and through his

attorney, SPECIAL HAGAN, ESQ., complains of Defendants:  JOHN JAY INSTITUTE

FOR JUSTICE AND OPPORTUNITY/CITY UNIVERSITY OF NEW YORK

("INSTITUTE"); RESEARCH FOUNDATION FOR THE CITY UNIVERSITY OF NEW

YORK ("RF CUNY"); RESEARCH CONSORITUM OF JOHN JAY ("CONSORTIUM");

SUSAN BATKIN ("BATKIN"); ANN JACOBS ("JACOBS") and KATHERYNE RALPH

("RALPH") in their individual capacities and as aiders and abettors.


# I.      INTRODUCTORY STATEMENT

1.   This is an action for injunctive relief, declaratory judgment, equitable relief, money

     damages and punitive damages on behalf of PLAINTIFF, JUAN MOLINA (MOLINA

     or PLAINTIFF).  MOLINA contends that he experienced: racial discrimination;

     discrimination based on his sexual orientation and prior conviction history; a hostile

work environment based on his race and sexual orientation; an ongoing retaliatory hostile work environment based on his protected statuses and protected activities; and a continuing violation of his rights and constructive discharge;

2. PLAINTIFF alleges that the terms, conditions and privileges of his employment relationship with Defendants have been adversely affected under:  28 U.S.C.. § 1658; 29 U.S.C. § 2601, Family Medical Leave Act ("FMLA"); 42 U.S.C. § 2000e ("Title VII"); 42 U.S.C. § 1988; 41 U.S.C. § 4712,; New York Labor Law § 740 ("NYLL § 740"); the New York State Human Rights Law as contained in New York Executive Law § 296 et. seq. ("NYSHRL"); and the New York City Human Rights Law 8-107(1) et. seq. ("NYCHRL")

## II.      JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to §§ 1331 and 1343 to secure protection of and to redress the deprivation of rights secured by Title VII, FMLA and 41 USC § 4712.

4. This Court has supplemental and pendant jurisdiction pursuant to 28 U.S.C. § 1367(a) over the PLAINTIFF's state and city law claims arising under the New York State Executive Law and the New York City Administrative Code respectively, because the PLAINTIFF's federal, state and city claims derive from a common nucleus of operative facts and form part of the same case or controversy.

5. PLAINTIFF's action for declaratory relief is authorized by 28 U.S.C. §§ 1343, 2201 and 2202.

### III.   **PARTIES**

6.  MOLINA identifies as an Afro-Latino pansexual/homosexual male.[1]

7.  MOLINA has two prior convictions:  he was incarcerated from 1998 to 2007 and again from 2016 to 2018.

8.  At all times relevant, PLAINTIFF is an employee within the meaning of Title VII and the other statutes referenced herein.

9.  MOLINA is a resident of the State and City of New Jersey.

10. At all times relevant, John Jay Institute for Justice/City University of New York (INSTITUTE/CUNY) is an employer within the meaning of Title VII and the other applicable statutes referenced herein.

11. At all times relevant, Defendant INSTITUTE/CUNY states as its mission:  "[the provision of] a continuum of services within correctional facilities and in the community that engages with system impacted people wherever they are in their academic journey, connecting them to programs at CUNY and services within New York City."  Accordingly, the INSTITUTE/CUNY is authorized to do business in the County, City and State of New York.

12. At all times relevant, Defendant INSTITUTE/CUNY employed between 40 and 50 employees.

13. RF CUNY was established as a not-for-profit educational corporation chartered by the State of New York in 1963.

---

[1] https://lgbt.hms.harvard.edu/files/lahms/files/terminology_guide_5.15.2020.pdf

14. At all times relevant, Defendant RESEARCH FOUNDATION OF THE CITY UNIVERSITY OF NEW YORK (RF CUNY), is an employer as defined by Title VII and the other applicable statutes referenced herein.

15. At all times relevant, Defendant RF CUNY is a 501(c)(3) that is authorized to do business in the County, City and State of New York.

16. At all times relevant, Defendant RF CUNY has employed over 20 employees.

17. Defendant RF CUNY states that it supports CUNY faculty and staff in obtaining external support from government and private sponsors (pre-award), and is responsible for the administration for all such funded programs (post award).

18. Upon information and belief, at all times relevant, DEFENDANT INSTITUTE/CUNY employed the named Defendants.

19. At all times relevant, RF CUNY: processed the INSTITUTE's payroll; presided over the administration of the INSTITUTE's budgets; and implemented/enforced personnel decisions and complaint procedures that involved employees who worked for or provided services at the INSTITUTE.

20. Upon information and belief, RF CUNY was the employee of record for MOLINA, BATKIN and RALPH.

21. At all times relevant, the RESEARCH CONSORTIUM FOR JOHN JAY (CONSORTIUM) operates under John Jay College's, Office for the Advancement of Research.  The INSTITUTE is one of twelve members who are prescribed with addressing the: "challenges of the criminal justice community and protecting the public's safety."

4

22. At all times relevant, the CONSORTIUM was authorized to do business in the County, City and State of New York.

23. At all times relevant, the CONSORTIUM employed over 20 employees.

24. At all times relevant, Defendant SUSAN BATKIN ("BATKIN") served as Deputy Director of Programs.

25. BATKIN was PLAINTIFF'S supervisor from May 2019 to November 5, 2022.

26. At all times relevant, BATKIN had the ability to hire, fire, promote and or demote PLAINTIFF.

27. BATKIN acted directly and personally in the allegations stated herein.

28. Upon information and belief, BATKIN identifies as a Caucasian cis-gendered/heterosexual woman.

29. Upon information and belief, BATKIN does not have a prior record of conviction.

30. DEFENDANT BATKIN is sued here in both her individual capacity, and as an aider and abettor.

31. At all times relevant, DEFENDANT ANN JACOBS (JACOBS) served as Executive Director.

32. JACOBS was PLAINTIFF'S supervisor throughout the term of his employment.

33. JACOBS acted directly and personally in the allegations stated herein

34. At all times relevant, JACOBS had the ability to hire, fire, promote and or demote PLAINTIFF.

35. At all times relevant, as Executive Director, JACOBS had an obligation to investigate complaints of fraud, waste, abuse and discrimination.  She was also prohibited from engaging in retaliation in the event such complaints were filed.

36. Upon information and belief, JACOBS identifies as a Caucasian homosexual woman.

37. Upon information and belief, JACOBS does not have a prior record of conviction.

38. DEFENDANT JACOBS is sued here in both her individual capacity, and as an aider and abettor.

39. At all times relevant, DEFENDANT KATHERYNE RALPH (RALPH) served as the Director of Human Resources (Director of HR).

40. At all times relevant, RALPH had the ability to affect the terms and conditions of PLAINTIFF's employment.

41. At all times relevant, RALPH had the ability to hire, fire promote and or demote PLAINTIFF.

42. At all times relevant, RALPH was tasked with investigating complaints of discrimination, fraud, waste, abuse and or retaliation.

43. At all times relevant, RALPH failed to investigate PLAINTIFF's complaints.

44. RALPH acted directly and personally in the allegations stated herein.

45. Upon information and belief, RALPH identifies as an African American cis-gendered/heterosexual woman.

46. Upon information and belief, RALPH does not have a record of prior conviction.

47. DEFENDANT RALPH is sued here in both her individual capacity, and as an aider and abettor.

48. At all times relevant, the following entities acted as MOLINA's employers:  the John Jay Institute for Justice and Opportunity; the Research Foundation for CUNY; and the Research Consortium for John Jay.

### III.FACTUAL ALLEGATIONS

**A.  Background Information**

49. The INSTITUTE was founded in 2005 under the previous moniker:  Prison Re-Entry
   Institute.  The program obtained its current name in 2020.

50. PLAINTIFF is an Afro-Latino male who identifies either as pansexual or homosexual.

51. PLAINTIFF has a record of prior convictions, which he disclosed to Defendants on
   his job application.

52.  MOLINA has a Bachelors in Health Administration from Lehman College and a
   Master's in Public Administration from NYU.

53. At the time relevant, MOLINA had over 20 years of professional experience.

54. Accordingly, at all times relevant, PLAINTIFF was qualified for the positions for
   which he applied and worked.

**B.  JACOBS Discriminates Against MOLINA and Insists He Works in the
   Lesser Mentoring And Alumni Coordinator Position**

55. PLAINTIFF interviewed with JACOBS and Sasha Graham (Graham) in or around
   May 2019.

56. At that time, MOLINA applied for the Director of Career Pathways position.

57. MOLINA's collegiate education and experience in the field, along with his conviction
   history made him the ideal candidate for the Career Pathways directorship.

58. During the interview, JACOBS made the unilateral determination that MOLINA was
   not qualified for the position.  It was at this time that she directed him towards the
   lesser Mentoring and Alumni Coordinator position.

59. JACOBS never disclosed why she believed that MOLINA was not qualified for the
   Director of Career Pathways position.

60. However, instead of hiring MOLINA, JACOBS hired Drew Oldfield (Oldfield).

61. Oldfield is a white male that at the time he was hired to Director of Career Pathways position, only had a high school diploma.

62. Since MOLINA  had previously mentored Oldfield when he previously worked at the INSTITUTE.

63. Therefore, MOLINA had personal/direct knowledge both from Oldfield and from the records kept by the INSTITUTE, that at the time Oldfield was hired to work as the Director of Career Pathways, he had less than the required educational experience and less professional experience than MOLINA.

64. Oldfield's lack of qualification for the position was ultimately revealed upon his termination from the organization.

65. Upon information and belief, Oldfield was terminated from the position because of workplace misconduct.

66. MOLINA started as Mentoring and Alumni Coordinator on May 6, 2019.

67. The Mentoring and Alumni Coordinator position paid $25,000 less than the Director of Career Pathways position that MOLINA originally sought.

**C.  MOLINA & Minority Staff Experiences Racial Hostile Work Environment at John Jay Institute for Justice and Opportunity**

68. During the course of his employment, PLAINTIFF along with other Black and Brown staff members, would experience blatant discrimination and microaggressions from JACOBS, BATKIN and RALPH.

69. The Harvard Business Review has defined microaggressions as statements, questions or assumptions aimed at traditionally marginalized identity groups.  The

statements or comments generally relate to the employee's race, gender, sexuality or any other aspect of their identity.[2]

70. The term microaggressions is a misnomer, since research has found that over the course of a person's career, they can cause: increased rates of depression; prolonged stress and trauma; physical concerns like headaches and high blood pressure; anxiety; difficulty breathing; and difficulties with sleep.  MOLINA experienced all of these symptoms and more before he was constructively discharged.[3]

71. Besides being denied professional opportunities, managerial positions and promotions, Black and Brown staff members were often ignored and ridiculed by JACOBS and BATKIN.

72. Staff members across racial backgrounds complained about Defendants' discriminatory practices towards Black and Brown staff persons.

73. Upon their departure, one staff person wrote in an email: "the Institute was an oppressive and dysfunctional culture that was characterized by power hoarding and performative overtures towards staff members of color."

74. In her departing email, Zoe Johnson, a Caucasian former staff person, wrote: "[The] Institute [was] a white led organization that has programmatic initiatives aimed at Black and Brown marginalized people."  She also observed that the Institute was part of the non-profit white led industrial complex.

---

[2] Washington, Ella, "Recognizing and Responding to Microaggressions at Work," https://hbr.org/2022/05/recognizing-and-responding-to-microaggressions-at-work
[3] Id.

75. On November 24, 2021, Johnson also wrote: "I hope leadership will reflect and be open to staff suggestions and change shared decision-making that is not performative… with salary transparency and paying people a living wage and ultimately making way for Black leadership."

76. BATKIN had a contentious relationship with MOLINA.

77. BATKIN would often belittle and engage in tone policing with MOLINA.

78. BATKIN frequently ignored, belittled and disrespected minority staff members.

79. Under BATKIN, JACOBS and RALPH, Black and Brown staff members who had prior convictions were denied promotional opportunities, and in some instances were fired when they sought them.

80. On more than one occasion, PLAINTIFF heard Defendants make the comment that he and others with prior convictions ought to be glad they had a job.

81. It was a known fact that the work environment at the INSTITUTE had become so hostile under JACOBS, BATKIN and RALPH that they hired a consultant to address the tensions in the workplace.

### i.    Molina's Performance Leads to Increased Responsibilities without Promotion in Title or Pay

82.  At all times relevant, MOLINA worked as the Mentoring and Alumni Coordinator for the College Initiative (CI) Program.

83. CI was an independent entity for 13 years.  CI became part of the INSTITUTE's continuum of services in 2015.

84. Once CI was absorbed into the INSTITUTE, it became the largest program in their portfolio; it also became the model for similar programs throughout the country.

85. The CI model included: academic counseling; peer mentoring and alumni networking; community engagement; and wraparound support services.

86. The CI model also worked with the Supportive Services Unit to ensure that persons with carceral histories who sought higher education would have their non-academic needs met, including but not limited to the following areas:  housing, employment, benefits and healthcare.

87. MOLINA's job functions as Mentoring and Alumni Coordinator included but were not limited to the following tasks: develop curriculum for peer mentor training; train, manage and coach professional development of peer mentors leverage relationships with partners to drive program participation; create digital and media content for INSTITUTE platforms; form alumni network and community advisory boards; and represent the INSTITUTE at events throughout New York.

88. When MOLINA was initially hired, he was supervised by Carlos Quintana (Quintana) and Antonia Salerno (Salerno).

89. Quintana left in May 2021 and Salerno went on maternity leave. At which time, Defendants assigned MOLINA both of their job functions.

90. Upon the departures of Quintana and Salerno, PLAINTIFF's direct report became BATKIN.

91. As Deputy Director of Programs, BATKIN reported to JACOBS.

92.  Upon Quintana's departure, MOLINA applied for Quintana's position. Defendants did not interview or hire MOLINA for the.

93. Upon the departure of Salerno and Quintana, MOLINA's performed the following additional job functions:  designing oversight of the work of 5 academic counselors;

and acted as a program associate on the Anti-Racism Committee, Return to Work Committee, Strategic Planning Committee, the Mayor's Office of Criminal Justice and CUNY REP Initiative.

94. Between May 2021 and September 2022, MOLINA performed the job functions of the work equivalent of three staff persons.  Furthermore, he did not take on these additional tasks voluntarily.

### D. MOLINA and BIPOC staff Experience a Retaliatory Hostile Work Environment When they Pursue Promotions and Speak Out Against Discrimination

95. In June 2021, MOLINA complained to BATKIN about her disparate treatment and microaggressions towards employees with prior convictions at the Institute.

96. When MOLINA was initially hired, he did not officially supervise any staff members. However, upon the departure of Quintana and Salerno, this changed. By that time, he assumed supervision of Able-Brown, Ayisha Ferrell and three other staff persons.

97. At the time, BATKIN directed MOLINA to write up Able-Brown even though Ferrell had been insubordinate and was a poor performer.

98. MOLINA confronted BATKIN and attributed the disparate treatment towards the microaggressions that BATKIN evidenced towards employees like himself, who had prior convictions.

99. Despite clear evidence of insubordination, BATKIN also refused to write-up Ferrell. It was at this juncture, that his relationship with BATKIN became irreparable.

100.    In or around July 15, 2021, MOLINA sent BATKIN his Work Plan.  BATKIN responded in a fashion that amounted to nothing other than tone policing.

101.   BATKIN's email insinuated that MOLINA had used sarcastic language to describe staff morale.  MOLINA responded that he simply conveyed what staff had told him about their experience at the INSTITUTE.

102.   From MOLINA's experience, BATKIN's comments were microaggressions directed at him because of his race, sexual orientation and status as a felon. BATKIN generally spoke to employees' with MOLINA's background in a similar hostile fashion and often ignored if not berated them when they asserted themselves.

103.   BATKIN knew that MOLINA had over 20 years of professional experience, but by this time she had taken on the posture that PLAINTIFF needed to be taken down a notch and put in his place.

104.   According to BATKIN's directive, MOLINA re-submitted the workplan in or around July 18, 2021.  BATKIN ignored the submission and refused to send it to JACOBS and RALPH.

105.   BATKIN's refusal to forward the workplan would have dire consequences for MOLINA during the remainder of his employment. First BATKIN and subsequently JACOBS would lie about MOLINA's production of a workplan any time he engaged in protected activity thereafter.

**E.  INSTITUTE: Racially Hostile Work Environment Rife with Poor Management and High Attrition**

**i.   Dr. Bukky's Lunch and Learns Reveal a Discriminatory Work Environment and Dysfunction**

106.    Due to the hostile work environment and high rate of attrition of Black and Brown
staff members at the INSTITUTE, on July 28, 2021, Defendants scheduled
consultant Dr. Bukky Kolawole (Dr. Bukky) to do Lunch and Learn sessions.

107.    Dr. Bukky discussed a number of topics to address the racial tensions: from
George Floyd and police brutality to problems with internal management.

108.    PLAINTIFF spoke out during the course of this lunch and learn about the
discrimination and poor management exhibited by BATKIN and JACOBS.

109.    Dr. Bukky then followed up with pointed questions directed at JACOBS about her
role in the attrition of staff and racial hostilities.

110.    Displeased  with the questions, JACOBS ended Dr. Bukky's contract.  JACOBS
also made sure that Dr. Bukky would not get any more consultant positions at any of
the other CUNY campuses.

**ii.      MOLINA Experiences Retaliation in the Wake of Protected Activities.**

111.    During the Lunch and Learn in or around September 24, 2021, MOLINA spoke
out against the discrimination and lack of professional opportunities that he and
other BIPOC staff experienced at the INSTITUTE.

112.    In the wake of Dr. Bukky's final session, JACOBS encouraged staff to develop an
"Anti-Racism Committee (ARC).

113.    Since MOLINA had spoken out at the heated session with Dr. Bukky, JACOBS
forced him to participate in the Diversity Equity and Inclusion Committee.

114.    MOLINA was offended by JACOB's performative gesture, but nonetheless
participated in drafting and circulating a survey to staff.

115.    62% of the staff responded to the survey.

116.   However, when it appeared that Black and Brown staff seized the opportunity to openly express their dissatisfaction with the employment conditions and career opportunities at the INSTITUTE, RALPH and JACOBS issued email directives to cease and desist with the survey.

117.   In or around August 1, 2021, Salerno would return from maternity leave.  In or around August 26, 2021, Salerno decided to resign.

118.   Upon her departure, Salerno conveyed to MOLINA that she partially based her decision on the dysfunctional and hostile work environment under JACOBS, BATKIN and RALPH.

119.   At Defendants' behest, MOLINA continued to perform additional work throughout September 2021.

120.   In or around September 9, 2021, MOLINA had approached JACOBS with the Voices of Change Initiative.  JACOBS deceptively encouraged MOLINA to move forward with the proposal.

121.   JACOBS's intentions to set MOLINA up were revealed on September 13, 2021. Even though there was an absence of protocol around the proposal of initiatives and fundraising, and despite JACOBS's feigned enthusiasm, BATKIN attacked MOLINA for working on the proposal.

122.   BATKIN lied about MOLINA's performance and the absence of a workplan, and used that as pretext to remove his supervisory responsibilities and job functions.

123.   BATKIN also falsely accused MOLINA of proceeding without a budget and of soliciting other units for funds.  This was despite the fact that the Voices of Change proposal would touch and concern all of the units at the INSTITUTE.

124.    MOLINA responded to BATKIN's email on September 17, 2021.  At that time he defended his actions by referencing email correspondence he had received from both BATKIN and JACOBS.

125.    MOLINA also complained of discrimination in the September 17, 2021 email. PLAINTIFF noted that had he been a 57 year old white male or female, he would have been promoted by BATKIN and JACOBS by then.

126.    MOLINA's representations were supported by the demographic composition of JACOBS's direct reports at the time.  During the time relevant, none of JACOBS's direct reports had records of prior convictions, and with the exception of RALPH, all of them were white.

127.    The September 17th discrimination complaint also pointed out that the organization had lost 5 BIPOC (people of color) that BATKIN had supervised within the past year.  MOLINA concluded the email with the statement that he sought mediation with BATKIN and that he sought to file a complaint of discrimination with RALPH.

128.    MOLINA asked RALPH to provide him with forms to internally exhaust his remedies before he filed with the State Division of Human Rights.

129.    In response to this email. BATKIN removed the counseling function from MOLINA's job.  This had the effect of silencing MOLINA amongst staff and diminishing his role in the organization.

130.    Also almost instantaneously after the September 17th complaint, BATKIN removed the staff persons MOLINA was assigned upon the departures of Quintana and Salerno.  BATKIN was also use the false accusation that MOLINA had failed to

provide her with his workplan as justification for the adverse employment actions.

Also in or around that time BATKIN falsely accused MOLINA of having poor follow

through, this was despite the fact that up until he complained of discrimination, both

she had JACOB had consistently increased PLAINTIFF's workload.

131.   The truth was that MOLINA had given BATKIN the workplan prior to leaving for

his vacation, and that BATKIN refused to acknowledge receipt of the plan and she

refused to forward the plan to JACOBS and management.

132.   MOLINA broached the subject of a promotion and raise again in his email on the

17th.  By that time, he had been performing the work of three people without an

increase in pay or title for at least 4 months.

133.   Upon information and belief, none of any of JACOBS's or BATKIN's direct

reports had as heavy a workload as MOLINA.  Upon further information and belief,

none of them were paid as little as MOLINA.

134.   Additionally, none of JACOBS's and or BATKIN's direct reports had prior records

of convictions or were homosexual/pansexual males.

135.   Defendants again refused to hire MOLINA for the position despite the fact that he

had begun to perform some of Quintana's job functions.

136.   Additionally, in a further effort to obscure their animus, Defendants failed to fill

Quintana's position while PLAINTIFF worked at the INSTITUTE.  Instead they

waited until he was constructively discharged to fill the position with a Black male.

137.   PLAINTIFF would learn from RALPH that JACOBS refused to promote him

because he was too "flamboyant."

138.    MOLINA is openly pansexual and or homosexual, and disclosed his sexual orientation to JACOBS.  In fact, it was because JACOBS disclosed her orientation to him, that MOLINA initially felt comfortable discussing his background with her.

139.    However, JACOBS would often make derisive comments both to him and other staff members that he was rude and catty. JACOBS would also talk about his pants being too tight and how MOLINA dressed.

140.    PLAINTIFF followed through with RALPH and RF CUNY about the September 17th discrimination complaint before he went out on leave.

141.    RF CUNY Labor and Employment Relations stated that they had never seen the complaint, that they didn't have a file for him.

142.    MOLINA took leave not only to care for his mother but to protect his mental well-being and his health which had also begun to decline due to the hostile work environment at the INSTITUTE.

143.    Therefore the combination of the microaggressions MOLINA experienced from BATKIN, JACOBS and RALPH on a daily basis; the arguments he had with JACOBS and BATKIN; along with the repeated times he was passed over for positions, MOLINA was forced to take FMLA.

144.    JACOBS and RALPH fired another  Black staff member on the spot, after she made repeated attempts to obtain a higher position within the organization.

145.    Upon information and belief, the Grants Officer sought to fill the Chief Financial Officer position that was left vacant. Before the vacancy JACOBS and RALPH had praised the employee's performance.

146.    Under the unscrupulous ruse of an interview, JACOBS and RALPH invited the

staff person in for a meeting.  The staff person believed she was going to be

interviewed, instead without any explanation and without any critique of her

performance or credentials, JACOBS and RALPH fired the staff person on the spot.

147.    The Black staff person confronted JACOBS and RALPH about the discrimination

and waste of resources.  She wrote and verbally told JACOBS: " [she] was crushing

souls and wasting money."   The staff person also told RALPH that JACOBS and

management at the INSTITUTE were incompetent, and that the students were

suffering at the hands of their ineptitude.

### iii.    JACOBS and RALPH Retaliate Against  MOLINA and Two Additional Staff with Prior Convictions who take FMLA

148.    Defendants continued to retaliate against MOLINA when he returned from leave

on November 8, 2021.

149.    Upon his return, PLAINTIFF would learn that BATKIN had resigned.  RALPH

would tell him that since she had resigned there was no need to investigate; that it

was not the organization's practice to investigate complaints upon the departure of

one of the parties.

150.    Upon BATKINS's departure, JACOBS assumed direct supervision of MOLINA.

151.    JACOBS continued to have MOLINA perform the job functions of three people.

She also refused MOLINA's requests for promotions in title and salary.  When

MOLINA asked for promotions, she told him that there were no other jobs at any

other rate of pay for him there at the INSTITUTE.

152.    JACOBS also continued with the false narratives that MOLINA had exempted

himself from a training session and that he failed to provide a workplan.

153.   MOLINA had uploaded the workplan into the shared system, and had provided

JACOBS with the workplan once again before their meeting in November 2021.

154.   Additionally, Elena Sigman had to intervene on MOLINA's behalf, after JACOBS

wrote a scathing email that falsely accused MOLINA of "exempting" himself from

training.  Sigman had to remind JACOBS that MOLINA had pre-approved FMLA

prior to JACOBS signing him for the training.

155.   Defendants fired at least two other staff persons with prior convictions

immediately after PLAINTIFF was constructively discharged from the Institute.

156.   The other two staff persons had records of prior convictions, the other two staff

persons had endured discrimination and harassment based on their prior records

and race.  Further, the other two staff persons had asked Defendants for promotions

and were filed immediately after they returned from FMLA leave.

### iv.    MOLINA's Constructive Discharge

157.   On November 18, 2019, JACOBS escalated her attacks against PLAINTIF and

again falsely accused MOLINA of not submitting his work plan to her.

158.   During the course of her exchanges with MOLINA, JACOBS would also reveal

that the organization had not acted on or reported his complaint of discrimination.

159.   In response, MOLINA continued to complain about discrimination, the disparate

treatment and JACOBS repeated refusal to formally promote him into the title for the

work he had been performing for months.

160.   Also in around that time, MOLINA confronted JACOBS about the inflation of

number of program participants and delivery; he also raised the issue about the

waste of funds.  MOLINA expressed to JACOBS that he had hoped not to experience retaliation for whistleblowing

161.    In response to MOLINA's complaints in or around November 18, 2021, JACOBS told him to tender his letter of resignation. MOLINA was constructively discharged for fighting against discrimination, for seeking pay parity and for whistleblowing.

162.    On November 23, 2021, after he tendered his letter of resignation, and after his conversations with JACOBS and RALPH where both told him that his discrimination complaints had not been investigated, MOLINA was left with no other recourse than to file a charge of discrimination with the State Division of Human Rights.

163.    In the wake of PLAINTIFF's constructive discharge, but during the tenure of JACOBS, BATKIN and or RALPH, at least 90% of the INSTITUTE's staff had either resigned, were constructively discharged or terminated.

## FIRST CLAIM OF RELIEF
## RACE, SEXUAL ORIENTATION and RECORD of PRIOR CONVICTION IN VIOLATION OF Title VII, NYSHRL & NYCHRL

164.    PLAINTIFF hereby re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

165.    PLAINTIFF is an Afro-Latino, openly pansexual/homosexual male with over 20 years of professional experience.

166.    At the time relevant PLAINTIFF disclosed that he was two credits short of completing his Master's Degree and that he had obtained a Bachelors in Health in Administration.

167.   PLAINTIFF's job responsibilities were consistently increased during the course of his tenure until he began to complain about discrimination and disparate treatment.

168.   PLAINTIFF was passed over for the Director of Career Pathways position for a lesser qualified white male without a college degree at the time he assumed the position.

169.   Upon the departure of two of his superiors, MOLINA continued to apply for their positions while performing their job functions.

170.   Defendants refused to promote PLAINTIFF and instead kept the position different.

171.   Minorities and or persons with prior convictions at the INSTITUTE complained of being passed over for positions and promotions.

172.   During the time relevant, (i.e. from May 2019 onward), despite their qualifications, Defendants would not fill the positions with PLAINTIFF and his similarly situated colleagues.

173.   Instead Defendants constructively discharged and or fired those who persisted in seeking professional opportunities.  Upon information and belief this took place with PLAINTIFF, Kenneth Inniss and at least one other person.  Each of these individuals had prior convictions and had extensive professional experience.  In each instance, Defendants gave them disproportionate workloads in comparison to their comparators and forced them out when they took FMLA due to the stress of the work environment.

174.   PLAINTIFF and other similarly situated employees experienced Defendants' ire and were made to feel that they should be glad to have jobs.

175.   As a proximate result of DEFENDANTS' racial discrimination against PLAINTIFF, MOLINA has suffered and continues to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits.

176.   As a further proximate result of DEFENDANTS' actions, PLAINTIFF has suffered and continues to suffer severe and lasting embarrassment, humiliation, anguish, and other incidental and consequential damages and expenses.

177.   DEFENDANTS' conduct was outrageous, malicious, and was intended to injure PLAINTFF's civil rights.  Therefore, PLAINTIFF is entitled to an award of punitive damages.

**SECOND CLAIM OF RELIEF**
**HOSTILE WORK ENVIRONMENT & RETALIATORY HOSTILE WORK**
**ENVIRONMENT**
**IN VIOLATION OF Title VII, NYSHRL AND NYCHRL**

178.   PLAINTIFF hereby re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

179.   PLAINTIFF identifies as Afro-Latino and  pansexual/homosexual.

180.   Upon information and belief, with the exception of DEFENDANT RALPH, DEFENDANTS identify as White.

181.   DEFENDANTS permitted an environment where discrimination, retaliation and harassment were permitted without consequence.

182.   DEFENDANTS conducted sham investigations, despite multiple complaints of discrimination from PLAINTIFF and other employees.

183.    Due to the ongoing animus, discrimination and retaliation PLAINTIFF, as well as

at least three other Black staff members were constructively discharged and or

terminated.

184.    As a result of the foregoing, Plaintiff has lost wages, benefits, promotional and

job opportunities, and bonuses.

185.    Plaintiff has also suffered mental anguish, emotional distress, loss of enjoyment

of life, and has incurred damages.

## THIRD CLAIM OF RELIEF
## (RETALIATION IN VIOLATION OF FMLA)

186.    PLAINTIFF hereby re-alleges and incorporates by reference each and every

allegation set forth in the foregoing paragraphs as if fully set forth herein.

187.    From October 4, 2021 to November 8, 2021, PLAINTIFF took FMLA after

complaining of discrimination and to take care of his mother with lung cancer.

188.    At all times relevant, PLAINTIFF was a full-time employee.

189.    At all times relevant, PLAINTIFF had worked at least 1,250 hours and was

thereby eligible to take FMLA.

190.    At all times relevant, DEFENDANTS RALPH and JACOBS had notice that

PLAINTIFF had taken FMLA and the reasons why he took FMLA.

191.    PLAINTIFF had to go through and apply for FMLA with RALPH in her capacity as

Director of HR.

192.    As PLAINTIFF's immediate supervisor, JACOBS was on notice and had to

approve PLAINTIFF's FMLA.

193.    In response to MOLINA's complaint, JACOBS falsely accused PLAINTIFF of exempting himself from training, failing to submit his workplans.

194.    In further retaliation of MOLINA's protected activity, JACOBS rejected his request for a promotion during their meeting in November 2021, and upon his return from FMLA.

195.    In or around November 23, 2021, MOLINA was constructively discharged.

196.    As a result of the foregoing, PLAINTIFF has lost wages, benefits, promotional and job opportunities, and bonuses.

197.    PLAINTIFF has also suffered mental anguish, emotional distress, loss of enjoyment of life, and has incurred damages.


### FOURTH CLAIM OF RELIEF: WHISTLEBLOWING IN VIOLATION OF 41 U.S.C. § 4172 AND NYLL § 740

198.    PLAINTIFF hereby re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

199.    During his meeting with JACOBS in or around November 2021, PLAINTIFF reported that there was rampant waste and fraud with the programs

200.    MOLINA disclosed to JACOBS that reports with false data regarding the number of students served and the number of programs provided had been submitted to funders so that they could obtain more funding.

201.    After the meeting ended, within minutes, JACOBS called MOLINA and told MOLINA to tender his resignation.

202.    As per JACOBS's directive on November 23, 2021, MOLINA was constructively

discharged and tendered his letter of resignation.

### FIFTH CLAIM OF RELIEF:
### AIDING AND ABETTING
### IN VIOLATION OF NYSHRL AND NYCHRL

203.    PLAINTIFF, realleges and incorporates by reference each and every allegation

set forth in the foregoing paragraphs as if fully set forth herein.

204.    The underlying violations of PLAINTIFF's civil rights have been established.  The

facts pleaded herein establish that the individually named DEFENDANTS personally

participated in the discriminatory and retaliatory conduct alleged.

205.     As a result of the foregoing,  PLAINTIFF has lost wages, benefits, promotional

and job opportunities, and bonuses. PLAINTIFF has also suffered mental anguish,

emotional distress, loss of enjoyment of life, and has incurred damages.

### PRAYER FOR RELIEF

WHEREFORE, PLAINTIFF seeks the following relief:

a)  A declaratory judgment that the practices complained of herein are unlawful;

b)  An award of damages in the amount of 100,000 to compensate PLAINTIFF for

his mental anguish, humiliation, embarrassment and emotional injury.

c)  An award of special damages in an amount of 100,000 for loss of compensation

and financial harm,

d)  An award of damages for loss of compensation and financial harm including lost

salary, income, fringe benefits, for a period of at least 5 years after PLAINTIFF's

date of discharge, in an amount that cannot be accurately determined at this
time;

e) An award of prejudgment and post-judgment interest;

f) An award of costs and expenses of this action together with reasonable
attorneys' and experts' fees and an award of a service payment to PLAINTIFF;
and

g) Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

by jury on all questions of fact raised in this Complaint.


Dated:  Queens, New York,
February 22, 2023                     By:          /s/ Special Hagan
                                                  _____
                                                  Law Offices of Special Hagan,
                                                  Esq.
                                                  88-08 Justice Avenue Apt. 16i
                                                  Elmhurst, New York, 11373
                                                  Telephone: (917) 337-2439
                                                  special@haganlawoffices.net
                                                  Attorney for Plaintiff